LITTLEJOHN & BULL, INC., Respondent, *v.* SIEGFRIED DEUTSCH and FREDERICK BANGERTER, Doing Business under the Trade Name of HERO SNAP FASTENER COMPANY, Appellants.

First Department, March 15, 1918.

Sale — action for breach of contract — evidence — admissibility of letter by seller's attorneys on question of repudiation — questions for jury — market for articles — explanation of change in testimony — appeal — right of seller to raise question of plaintiff's willingness and ability to perform.

The complaint in an action by a purchaser stated two causes of action: (1) For the failure of the defendant seller to deliver the balance of the articles purchased under the terms of a written contract, and (2) for the entire breach of another written contract to deliver such articles. The contracts were sought to be established by letters, cablegrams and conversations between the parties. Evidence examined, and

*Held,* sufficient to establish the first contract but insufficient to establish a cause of action under the second contract.

It was error to exclude a letter of the defendant's attorneys offered in evidence for the purpose of showing a repudiation of liability under the contract, which was not admitted by the answer but was specifically denied thereby.

Although the plaintiff proved the contract alleged in its first cause of action, it was not entitled to a directed verdict, because there was a question of fact as to whether there was a market for the articles at the time in question, and if so what the market price was.

The question of the weight to be given to the original or corrected testimony of a witness was for the jury, as well as the reasonableness of the explanation given by him for a change in testimony as to commercial quotations.

The objection that plaintiff did not prove that it was ready, willing and able to perform its part of the contracts could not be raised by the defendant for the first time on appeal.

APPEAL by the defendants, Siegfried Deutsch and another, from a judgment of the Supreme Court in favor of the plain-

tiff, entered in the office of the clerk of the county of New York on the 14th day of December, 1916, upon the verdict of a jury rendered by direction of the court, and also from an order entered in said clerk's office on the 15th day of December, 1916, denying defendants' motion for a new trial made upon the minutes.

David Leventritt of counsel [Henry C. Burnstine with him on the brief; Burnstine & Geist, attorneys], for the appellants.

William D. Guthrie of counsel [Abraham Tulin, Du Bois Beale and Bernard Hershkopf with him on the brief], for the respondent.

DOWLING, J.:

The complaint herein sets forth two causes of action for breach of contract. The first cause of action is based upon the failure to comply with the terms of a written contract made on or about September 24, 1915 (embodied in letters passing between the parties), whereby plaintiff ordered from defendants, and the latter agreed to deliver to plaintiff, 500 great gross of snap fasteners, size 0, half white and half black, at $2.50 per great gross, less two per cent for cash, free alongside ocean steamer, New York city, and 2,000 great gross of snap fasteners, size 0, one-quarter white and three-quarters black, at $2.75 per great gross, less two per cent for cash, free alongside ocean steamer, New York city; the times of delivery being specified. On this contract, the deliveries amounted to 683 great gross only, leaving the balance undelivered, 1,817 great gross. The second cause of action is based on the entire breach of a written contract, made on or about October 30, 1915 (embodied in letters and cablegrams passing between the parties), whereby plaintiff ordered from defendants and the latter agreed to deliver to plaintiff 10,000 great gross of hero snap fasteners, size 0, in bulk, deliveries to be made at the rate of 300 great gross a week, beginning December 1, 1915, at $2.75 a great gross, less two per cent for cash, free alongside ocean steamship, New York city. The time for commencing delivery thereunder is alleged to have been to February 19, 1916, on or about which day defendants repudiated the contract and

announced that they would not perform the same or make any deliveries thereunder. A verdict in favor of plaintiff for the sum of $36,579.91 was directed by the trial court, being damages of $34,860.15, with the interest thereon. The recovery was based on the amount undelivered under both contracts (11,817 great gross) at the difference between a contract price of $2.75 per great gross and a market price of $5.70 therefor.

As defendants contend that neither of the contracts sued upon was proved upon the trial, it is necessary first to examine the evidence relied upon to establish them. As to the first cause of action for an aggregate of 2,500 great gross of fasteners, the following letters passed between the parties:

"*September 24th,* 1915.

" HERO SNAP FASTENER COMPANY,

"# 636 Broadway,

" New York City.

" GENTLEMEN.— We beg to order herewith the following Snap Fasteners:—

" Five hundred (500) Great Gross snap fasteners, size 0, half white and half black, at Two dollars and fifty cents ($2.50) per great gross, Two per cent (2%) off cash, Free along side Ocean Steamer, New York City.

" These goods are to be ready positively in time to ship by ' S. S. California ' sailing October 16th, and should be down at the Anchor Line Pier # 64, foot of 24th Street, no later than the morning of the Thirteenth. It is understood that we will pay cash for same. In this case the entire shipping and handling of the payment will be made by James Logie & Company, Produce Exchange, New York City.

" We beg to order as well Two thousand (2000) great gross of snap fasteners, size 0, one quarter white and three quarters black, for shipment as follows, Five hundred (500) great gross with the first delivery October 23rd, second delivery October 30th, third delivery November 6th, and fourth delivery November 13th. It is understood that we pay cash for same, at the rate of Two Dollars and seventy-five cents ($2.75) per great gross, less Two per cent (2%) cash, F. A. S. Ocean Steamer, New York City.

" We will give you more definite shipping instructions on this Two thousand (2000) great gross later. We will get this letter confirmed by Messrs. James Logie & Company.

" Yours Very Truly,

" LITTLEJOHN & BULL, INC.,

" CFL/F.               Per CHARLES F. LITTLEJOHN."

Defendants' response was as follows:

" HERO SNAP FASTENER Co.,

" 636–638 Broadway,

" NEW YORK, *Sept.* 24, 1915.

" Messrs. LITTLEJOHN & BULL,

     " 1270 Broadway,

          " N. Y. C.

" GENTLEMEN.— We herewith beg to acknowledge receipt of the following orders and the following conditions of snap fasteners. Five hundred great gross size 0, one half black and the other half white, at $2.50 per great gross, less two per cent for cash, free alongside Ocean Steamship, N. Y. C. We agree to have these goods ready in time for shipment on the steamship California, sailing October 16th, 1915. Two thousand great gross size 0, one quarter white, three quarters black to be shipped as follows:

" Five hundred great gross October 23rd, five hundred great gross October 30th, five hundred great gross November 6th, five hundred great gross November 13th, at $2.75 per great gross less two per cent. for cash free alongside Ocean Steamship N. Y. C.

" We also agree to allow you to sell our fasteners to other merchants in Great Britain at $2.75 less 2% cash per great gross, subject to our conditions of delivery, and will positively fill them at this price subject to delivery.

" Very truly yours,

" HERO SNAP FASTENER CO.,

" I. FRED GREENBAUM."

Contemporaneously with the delivery of plaintiff's letter to defendants, they were also handed the following letter from James Logie & Co., the parties referred to in plaintiff's letter:

"*Sept.* 24, 1915.

" HERO SNAP FASTENER CO.,

     " 636 Broadway,

         "' New York.

" DEAR SIRS.— We have pleasure in confirming Messrs. Littlejohn & Bull's letter of date regarding order he has placed with you for snap fasteners.

" When the fasteners are ready for shipment we shall be ¡ glad to look after the shipment of these for them and we guarantee the prompt payment of the bill for same.

" Any further information you may desire we shall be glad to furnish.

                 " Yours very truly,

" VP /JL                JAMES LOGIE & CO."

It seems to me that the writings of the parties made a valid contract for the sale of the 2,500 great gross of fasteners called for. Defendants cannot deny the validity of the contract to deliver 500 great gross, for they expressly agree in their letter to have same ready for shipment on October 16, 1915. But they contend that they never agreed to deliver the remaining 2,000 great gross, and that all they did was to acknowledge receipt of the order therefor, but that they never committed themselves to any acceptance of the order nor to its fulfillment. This position seems to me quite untenable. The acceptance by defendants of plaintiff's order was not drawn with the precision and detail of a formally drawn legal instrument, but it was not necessary that it should be carefully worded. Business men are free to draw their agreements in their own way, and letters, which clearly show the meeting of the minds of the parties upon the terms of a contract, are as competent to bring such a contract into existence, even if somewhat inartificially phrased, as if the greatest care were used to apply technical terms to every detail. In the letters under consideration it is impossible to read defendants' answer to plaintiff's offer without being persuaded that defendants intended thereby to accept not only the order for 500 great gross, but that for 2,000 great gross as well. The opening sentence acknowledges " receipt of the following orders and the following conditions." Then follows

the order for 500 great gross on plaintiff's terms, which defendants agreed to have ready for shipment as indicated.　Further follows the order for the 2,000 great gross, set forth on plaintiff's own conditions in detail, with times of shipment and terms of payment specified.　Why did defendants meticulously repeat the terms of plaintiff's order if it was not because they were accepting it, and desired no uncertainty as to the details thereof?　There was no reason for specifying how and when the 2,000 great gross were to be shipped, unless defendants were protecting themselves against a demand for immediate or early delivery.　If they were simply acknowledging receipt of a letter they would have said so, and then set forth what they agreed to furnish, and would have been bound only to supply that and no more.　But when they acknowledged receipt of orders and proceeded to specify how the total amount of both orders was to be shipped, which accorded with plaintiff's proposal, they accepted the latter, and a contract was made between the parties.　The last sentence of the letter begins, " We also agree," which confirms the construction placed upon what precedes as also constituting an agreement and contract.　Moreover, the letter of James Logie & Co. guaranteeing the account, speaks of an order, meaning an entire order, and this letter was in defendants' possession when they accepted plaintiff's order.　Further, the acts of the parties thereafter demonstrate conclusively that they both deemed a valid contract for the whole amount of 2,500 great gross existed between them, for not only did defendants deliver to plaintiff 683 great gross of these fasteners, which was more than the only amount they now claim they were obliged to deliver (500 great gross), but the cablegrams passing between the parties show that complaints frequently made by plaintiff to defendants of the failure to deliver the balance of fasteners called for by the contract were met, not by denials of the existence of such a contract, but by excuses for the delay.　Thus when plaintiff's representative cabled on October fifteenth to defendants, he said in part: " Inspect Fasteners Now Ordered Carefully Ship Rate Agreed Without Fail."　To this defendants replied by cable on October eighteenth, saying, among other things: " Cannot say till twenty-second what total shipment on Twenty-ninth will be.　Depends on deliveries

of brass. Hope to ship five hundred great gross twenty-ninth. Same amount both November fifth and sixteenth." Defendants evidently had no doubt then that they were under contract to deliver to plaintiff more than 500 great gross of fasteners. It is unnecessary to set forth at length the other cablegrams and letters passing between the parties, all of which tend to confirm the views hereinbefore expressed. I believe the evidence clearly justifies the finding that the contract for 2,500 great gross of fasteners was made between plaintiff and defendants as set forth in the first cause of action herein.

The question as to whether the contract set forth in the second cause of action was made, presents more difficulties in its determination. This alleged contract had its inception in a conversation between Mr. Littlejohn, plaintiff's president, and Mr. Greenbaum, defendants' sales manager, relative to the former's trip to England, about to be undertaken with a view largely to doing business in the selling of snap fasteners in that country. It was because of this conversation that defendants said in their letter of September twenty-fourth to plaintiff: " We also agree to allow you to sell our fasteners to other merchants in Great Britain at $2.75 less 2% cash per great gross, subject to our conditions of delivery, and will positively fill them at this price subject to delivery." On October fifteenth Mr. Littlejohn cabled from England to defendants, so much of the message as is relevant to this subject being as follows: " Will agree ten thousand great gross snap fasteners yearly twenty-five hundred quarterly, to retain exclusive representation British Isles Probably much more If I sell could you deliver rate one thousand great gross weekly for twenty-five weeks beginning November twentieth size ought If not how fast Can get big business if you can deliver Will only handle on exclusive basis as agreed." On the same day Mr. Littlejohn wrote to defendants as follows:

" On separate sheet I am sending copy of cable despatch to you today, an answer to which I look for at once.

" As the cable will have indicated, I am in a position to consummate big business, and at once, but it is up to you on deliveries. Further, as I told you when visiting you, I will not consider it on any other than an exclusive basis arrangement which I take it you are quite agreeable to.

First Department, March, 1918.                [Vol. 182.

" We were not at the time able to arrive at any definite figures as to what the territory should produce, and so we left this open until such time as we could get a line on things from this side.

" I have offered to take it up on a basis of doing at least ten thousand great gross yearly in order to retain the exclusive rights which you will admit is pretty substantial business from this quarter. Frankly I anticipate putting over something very much larger, if you can deliver and deliver promptly.

" The above refers mainly to size ought. In fact as far as immediate shipments beginning after November 20th are concerned, it is size ought that I have asked you to figure on.

" I have also asked that you give me an idea as to your position to deliver in quantities on size three ought (000) (3 0), also the largest size. I await your immediate response with interest."

On October eighteenth defendants cabled in response to the cable of the fifteenth, the part in reference to the proposed agreement being: " Exclusive representation granted but cannot promise deliveries large weekly quantities for five months. Probably could make deliveries of three hundred great gross after two months." Then on October twenty-first Mr. Littlejohn cabled the defendants, saying therein in relation to the proposed agency contracts: " Regarding future business. Everything depends delivery market needs goods now could close outright contract immediately between ten and twenty-five thousand great gross but three hundred weekly beginning two months too slow if you agree five hundred weekly beginning immediately after other shipments believe can close immediately can assure you steady business beyond that." Replying to this, defendants sent a cablegram on October twenty-second, the material part of which is: " Take order for three hundred weekly commencing December first and one hundred and fifty weekly of three 0." On October twenty-ninth defendants cabled to plaintiff: " Machines broke down shipping one hundred and eighty-five three hundred on sixth five hundred on fifteenth." The shipments referred to in the cable were under the first contract for 2,500 great gross. Defendants claim the words " machines broke down " amount to a direction to plaintiff not to proceed to close prospective

orders on the basis of the proposition of October twenty-second, but there is nothing to indicate that the message was so meant by defendants, or so understood by plaintiff; on the contrary, it is apparently only an excuse or reason offered by defendants for their failure to make deliveries as agreed under the first contract. Plaintiff then sent a cable message to defendants on November first, the relevant part of which is as follows: " Prior receipt cable closed ten thousand additional size ought. Must understand fully now about deliveries." On November second Mr. Littlejohn wrote to defendants from Edinburgh, the sentences referring to this matter being:

" I closed a few days ago for 10,000 more, about which I will write you more fully in my next. I want samples and deliveries on the largest size.

" Cable me these deliveries if you have not already done so, and mail some samples at once. I will take care of your entire output in everything before I leave here for at least six months, and could do a good deal more than that right now if you could tell me something definite.

" This is one of the main things that I made this trip for. I am going at things exhaustively and have got an acquaintance here, business and social, that gives me an outlet for your goods which I do not think any other New York exporter has. Without taking any undue credit to myself, I feel that I know the market, and know the conditions here to the ground."

On November twelfth Mr. Littlejohn wrote to defendants from London:,

" Please note as follows:— I have taken orders for your entire output 300 G. G. weekly for eight months. Please note that we will run the orders together, commencing 300 weekly November 20th regardless of what you ship on the ' Tuscania ' (October 29th) and ' Cameronia ' (November 6th). Owing to the extraordinary delay at the start it seems simpler to readjust it on this basis and I felt it was something I could conveniently promise and you could conveniently live up to.

" There is usually a steamer every week, Saturday, for Glasgow with an occasional break once a month or two weeks. On each steamer, then, sailing weekly, approximately 300 should go. If there is no sailing for a fortnight approximately

First Department, March, 1918.                    [Vol. 182.

600 would go on that particular vessel. A little more or a little less in each case is not very vital.

" To boil the whole thing down I want 300 G. G. size ought placquet fasteners from you beginning November 20th, after the first lot of 500 G. G. half white half black have been shipped (for which I pay you $2.50 less 2%) start shipping approximately 5/6th black and 1/6th white (for which I pay you $2.75 less 2%). The exact proportions of black and white do not have to be absolutely maintained at every shipment and it will not be necessary to separate the first lot of 500 from the rest except to your invoice to us. Take it all in all it would be simpler to ship indicating plainly by the boxes what the first lot of 500 is. I am sure you will understand.

" Please therefore note that I have sold the above as per your cabled and written advices to me. I have influenced my buyers to give me a liberal contract and to be very lenient with us about deliveries despite the exasperating delays at the start.

" Kindly therefore lend every effort to live up to every detail of this proposition as to deliveries.

" My buyers are prepared now to take 300 G. G. a week beginning November 20th. Kindly therefore do not ship any more than that on the 20th, even if you have more ready, as he insists now on regularity. Of course a few more, ten or twenty great gross does not much matter. If you are short — ship what you can, but of course there is no reason why you should be short on this very favorable arrangement."

On November fifteenth plaintiff cabled: " No reply cable thirtieth have sold entire output size ought eight months three hundred weekly beginning November twentieth therefore irrespective former shipments ship approximately three hundred California three hundred Tuscania." Then on November twenty-first came a letter from plaintiff to defendants, saying: " As my cables will have informed you, I have sold your output for a long time ahead — 300 a week of the size 0, for eight months, I can sell more than this, but as you can imagine it has required diplomatic work on my part to keep them in line. I have traveled widely all over the United Kingdom and my connections are of the best, and I do trust you will do

your share towards helping me out and delivering the goods with all despatch possible." Defendants never made any deliveries under the alleged contract, and finally repudiated liability thereunder on February 19, 1916, as shown by the letter of their attorneys, which was improperly excluded by the trial court and should have been received in evidence for the purpose of showing such repudiation, which was not admitted by the answer, as the trial court thought, but specifically denied thereby.

The complaint herein sets forth that " on or about the 30th day of October, 1915, the plaintiff and the defendants entered into an agreement in writing, whereby the defendants agreed to sell and deliver, and the plaintiff agreed to accept and pay for 10,000 great gross of Hero Snap Fasteners, size 0, in bulk, deliveries to be made of 300 great gross a week beginning December 1st, 1915, at $2.75 a great gross, less 2% cash, free alongside Ocean Steamship, New York City." The bill of particulars sets forth that the contract was made up by the various letters and cablegrams hereinbefore set forth (exclusive of the one dated October twenty-ninth). Examining them at the various stages of the negotiations, we find no definite offer susceptible of outright acceptance until the cablegram of October twenty-second.

The letter of September twenty-fourth left undetermined the amount of the purchase and the terms and time of delivery, and in fact the phrase " subject to delivery " left in doubt whether a binding contract was tendered by defendants. The cablegram and letter of October fifteenth did no more than indicate the minimum which plaintiff was willing to contract for on a quarterly basis, with exclusive representation for defendants in the British Isles, but came no nearer a definite agreement. The cablegram of October eighteenth carried the parties no nearer a common ground, the only thing offered being that plaintiff should have exclusive representation for them in the British Isles, but refusing to promise any large deliveries for five months and holding out only the probability of deliveries of 300 great gross after two months. Thus up to this date the only thing satisfactory to both was that plaintiff should have the exclusive agency for defendants

First Department, March, 1918.        [Vol. 182.

in the British Isles. After the receipt by plaintiff of defendants' cablegram of October twenty-second, reading all the letters and messages together, defendants' proposition to plaintiff was to give it the exclusive selling agency for its snap fasteners for sale to other merchants in the British Isles at two dollars and seventy-five cents per great gross, less two per cent for cash, with a yearly minimum of 10,000 great gross, deliverable 300 great gross weekly, commencing December first. This differed from plaintiff's last proposition both as to amount of weekly shipments (300 instead of 500) and the date of first shipment (December first instead of November twentieth). Therefore, to make a contract, plaintiff was called upon either to accept the defendants' proposition in writing, or so to act as to show its acceptance thereof and to estop it from ever after denying that it had so accepted and thus to act so unmistakably that defendants should produce proof of its acceptance if it breached the contract itself. In other words, the mutuality of agreement must be plain and susceptible of proof. By its pleading, plaintiff stood upon the first of these grounds, *i. e.*, that it had accepted defendants' offer. Nowhere is there in evidence a letter or cablegram from plaintiff which accepted defendants' terms as proposed in the cablegram of October twenty-second, which was their last word upon the subject. If plaintiff relies upon its cablegram of November first as an acceptance, then it appears upon its face that the meeting of the minds of the parties was not complete, for it reads, " Must understand fully now about deliveries." If it relies upon the letter of November second as constituting acceptance, then it was bound to prove that it had in fact done the act which it claimed induced its acceptance, *i. e.*, that it had complied with the terms of the cablegram of October twenty-second and taken orders for a minimum of 10,000 great gross, deliverable 300 weekly commencing December first. The remaining two letters and one cablegram from plaintiff only demonstrated that it was insisting on delivery beginning November twentieth, to which defendants never agreed. If the conditions were reversed, and the defendants were suing the plaintiff for breach of a contract to purchase 10,000 great gross of fasteners on the terms proposed by defendants, I am unable to see where the proof could be found in this

record to entitle them to a finding that such a contract had ever been entered into by plaintiff. To summarize, plaintiff has not proven the making of the contract set forth in the complaint as its second cause of action. Not only did it fail to show that it ever accepted defendants' offer of a contract, but it failed as well sufficiently to establish that it had acted on the faith of that offer and placed orders for purchases by third parties in accordance therewith, which is a ground now assigned for the affirmance of the judgment upon this cause of action. No such orders were produced upon the trial, and Mr. Littlejohn's testimony as to these orders is most vague and unconvincing. He believed he had writings in his possession to prove the resales made by them, but he did not produce them, he did not give the names of his buyers, and he dealt in mere generalities with no convincing details. Apart from this, there are only his self-serving declarations that such resales had been made, contained in his letters and cablegrams. If he had made such sales, the production of the orders would have at once ended any doubt. Not only is his testimony most unsatisfactory, but though he admitted his resale was made to one party and that the written order was in his custody, when defendants attempted to cross-examine him as to the taking of these orders, the trial court refused to allow them to examine the witness as to the details thereof, as to what concern the resale had been made to and as to the price at which they were resold. The witness fixed the date of placing the alleged order for resale variously at the latter part of October, October twenty-sixth or twenty-eighth, " or something like that," all of which antedate the alleged making of the contract between plaintiff and defendants as set forth in the complaint. I am of opinion that plaintiff did not prove its second cause of action as alleged, and that the judgment based thereon cannot be sustained, but a new trial must be ordered as to the same.

Although plaintiff proved the contract set forth in its first cause of action, I do not believe it was entitled to a directed verdict thereon. There was a question of fact for the jury as to whether there was a market for snap fasteners in New York at the time in question, and if so, what was the market price therefor. The plaintiff's evidence on both these

questions was made up of the testimony of Mr. Littlejohn, an interested witness, and of two experts who gave opinion evidence, and although the trial court directed a verdict upon the basis of the lowest market value testified to by the witness Lavin (five dollars and seventy cents), the witness Wardner had testified to lower figures for bulk goods (five dollars to five dollars and fifty cents); and while he afterwards returned to the stand and said he had testified erroneously and corrected his evidence so as to make the price six dollars to six dollars and twenty cents per great gross in bulk, the question of the weight to be given to his original or corrected testimony was for the jury, as well as the reasonableness of the explanation given by him for so great a change in testimony as to commercial quotations. Nor was the testimony as to the existence of an actual market for these goods so clear and convincing as to justify the direction of a verdict based on a fixed market price. For these reasons, the question of the amount of plaintiff's damages on the first cause should have been submitted to the jury.

The objection that plaintiff did not prove that it was ready, willing and able to perform its part of the contracts in question was raised for the first time on appeal, and I do not believe defendants were in a position to avail themselves of any such claim for the first time in this court.

The finding that plaintiff was entitled to recover as damages under its first cause of action the difference between two dollars and seventy-five cents and five dollars and seventy cents per great gross is reversed. The finding is also reversed that plaintiff and defendants entered into the contract set forth in the second cause of action.

The judgment and order appealed from will be reversed and a new trial ordered, with costs to appellants to abide the event.

CLARKE, P. J., SCOTT, PAGE and DAVIS, JJ., concurred.

Judgment and order reversed, new trial ordered, costs to appellants to abide event.